IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 15-87 |
| ) | Judge Nora Barry Fischer |
| KHYREE GARDENHIRE, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

I.  INTRODUCTION

This multi-defendant heroin trafficking conspiracy case is set for jury selection and trial to commence on April 24, 2017 at 9:30 a.m. Presently before the Court is a motion to suppress evidence filed by Defendant Khyree Gardenhire, ("Khyree"), (Docket No. 1808), and the Government's opposition thereto, (Docket No. 1953). The Court held a motion hearing on February 23, 2017, and the official transcript of the proceeding has been filed of record. (Docket Nos. 2014; 2035). Thereafter, the parties submitted findings of fact and conclusions of law on March 6, and 7, 2017, respectively.[1] (Docket Nos. 2052; 2056). After careful consideration of the parties' arguments in light of the record evidence and for the following reasons, Khyree's motion to suppress [1808] is denied.

II.  BACKGROUND

Khyree is charged with three counts in the Superseding Indictment: one count of conspiracy to distribute and possess with intent to distribute 1 kilogram or more of heroin, in violation of 21 U.S.C. § 846, for conduct occurring from in and around March 2012 to on or

---

[1] The parties were granted leave to file responses by March 15, 2017 but they declined to do so.

1

about May 21, 2015, (Count 1);[2] one count of attempt to possess with intent to distribute 1 kilogram or more of heroin, in violation of 21 U.S.C. § 846, for conduct occurring on or about August 1, 2014 to on or about August 2, 2014, (Count 2); and one count of possession with intent to distribute and distribution of heroin, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C), for conduct occurring on or about January 15, 2015, (Count 49). (Docket No. 1020). The potential penalties for counts one and two include a mandatory term of incarceration of 10 years and up to life imprisonment and the potential penalties for count 49 include a term of incarceration of up to 20 years' imprisonment. (Docket No. 1021).

Khyree seeks to suppress the evidence seized from him during a warrantless encounter with City of Pittsburgh narcotics detectives on January 15, 2015. (Docket Nos. 1808; 2056). The seized evidence included: over a brick of heroin recovered from his left pants pocket; five knotted baggies of crack cocaine recovered from the center console of the vehicle; $481.00 recovered from his person; a torn baggie corner recovered from the cup holder of the vehicle; and Samsung and LG cell phones recovered from his right jacket pocket. (Govt. Ex. 5; Docket No. 1953-4). Such evidence forms the basis of the charge at Count 49 of the Superseding Indictment and also supports the conspiracy charge at Count 1. (Docket No. 1020). The Government conceded that a warrantless search and seizure occurred and presented evidence supporting the reasonableness of same at the suppression hearing, including the testimony of City of Pittsburgh Bureau of Police Detective Scott Love and the police report authored by Detective Mark Goob. (Docket Nos. 1953-4; 2035). In this Court's opinion, based on Detective Love's demeanor and appearance at the hearing, he offered truthful and credible testimony to the Court, despite efforts to impeach him. *See United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir.

---

[2] The Court notes it denied Defendant's moved to dismiss Count 1 of the Superseding Indictment in a Memorandum Opinion dated February 23, 2017. (*See* Docket No. 2021).

2013) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)) ("'[w]hen findings are based on determinations regarding the credibility of witnesses ... for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'").

The following facts were established by a preponderance of the evidence. On the evening of January 15, 2015, Detective Love was on a detail investigating high crime areas which brought him to the Beltzhoover area. (Docket No. 2035 at 8). He was driving an unmarked Chevy Impala with two other narcotics detectives: Detective Goob, who was seated in the front passenger's seat; and, Detective Thomas Gault, who was in the rear passenger seat. (Docket No. 2035 at 8, 9, 12). The three detectives were all dressed in plainclothes, had worked together jointly on drug cases in the past and each have considerable law enforcement experience, much of which has been in the Narcotics Unit. (*Id.* at 7-8). To this end, Detective Love has 20 years of law enforcement experience and Goob has 22 years of law enforcement experience with 16 of it in the Narcotics Unit.[3] (*Id.*).

Detective Love stated that he has been involved in "thousands" of drug cases over his lengthy career, many of them involving crack cocaine and heroin. (*Id.* at 6). He explained in great detail how crack cocaine is packaged by dealers using sandwich baggies, cutting off the corners of the baggies, and then packaging the crack cocaine in the remaining portion of the sandwich baggie which he described as the "diaper" and is then tied using the two corners. (*Id.* at 6-7). He added that over the course of his career, he has learned that baggie corners are only used for one thing, "to package narcotics." (*Id.* at 7). Detective Love further described how 50 stamp bags of heroin are typically packaged as a brick, which is in a shape similar to a pack of

---

[3] The Court notes that Detective Good was unavailable to testify at the hearing because he was on leave. (Docket No. 2035 at 8).

Bubble Yum gum.  (*Id.* at 21).  He told the Court that he had observed bricks of heroin "thousands" of times such that they were easily recognizable to him.  (*Id.*).

Detective Love was driving on E. Warrington Avenue toward Beltzhoover Avenue near Red's Bar, in what he described as an "extremely" high crime area where he and his fellow detectives had made numerous arrests for drug and gun violations in the past.  (Docket No. 2035 at 9).  Indeed, Red's Bar was deemed a nuisance bar, several homicides had occurred in that area, and numerous drug deals had taken place in that vicinity as well.  (*Id.* at 9-11).  He testified that they would frequently conduct surveillance of Red's Bar, watching for drug deals outside of the bar, as well as individuals coming and going from the bar without any alcohol.  (*Id.* at 10-11).

It was a cold January evening, with temperatures below freezing.  (Docket No. 2035 at 14).  While it was dark outside, the area around Red's Bar is well lit with overhead street lights including lights illuminating a field that is across the street and a nearby rec center.  (*Id.* at 13, 24, 31).  The vehicle's headlights were also activated.  (*Id.* at 13).

As the detectives approached the 300 block of E. Warrington in the unmarked Impala at a speed of approximately 15-20 miles per hour, below the posted speed limit of 25 miles per hour, Detective Goob noticed two individuals sitting in a parked SUV that were looking down at the center console area of the vehicle.  (Docket No. 2035 at 13).  The SUV was across the street from Red's Bar and positioned facing the detectives as they approached.  (*Id.*).  Detective Goob conveyed his observation of the two individuals to the other detectives in the car and Detective Love observed the individuals as well.  (*Id.* at 13).  Detective Love said that although the SUV sits higher off of the street than the sedan they were traveling in, he could clearly see the individuals in the SUV because he sits up high in the car while driving due to his size as an above average man.  (*Id.* at 25, 32).  The detectives also thought that it was peculiar that the SUV

4

was not running because it was very cold at the time. (*Id.* at 11-14). The headlights and interior lights were also off at the time. (*Id.* at 31). Detective Love conceded that the car was legally parked, there were no apparent traffic violations, and they did not run the plates of the car. (*Id.* at 27-28). He likewise admitted that their observations took place over a period of only a few seconds and that he had no information that the individuals had been sitting in the car for a lengthy period of time or were involved in a crime. (*Id.*).

Given the detectives' observations of two individuals sitting in an SUV that was not running, despite freezing temperatures, in a high crime area, the detectives decided to conduct a mere encounter to investigate and determine what the individuals in the SUV were doing. (*Id.* at 11-14, 23). Detective Love then drove past the SUV, turned his vehicle around and parked behind the SUV, leaving a sufficient distance between the vehicles such that the SUV could have pulled away without any problem. (*Id.* at 15). He did not activate the sirens or emergency lights on the vehicle. (*Id.* at 13-14, 31-32).

The detectives exited their vehicle and approached the SUV, with Detective Goob walking toward the driver's side of the SUV and Detectives Love and Gault following slightly behind him toward the passenger's side of the SUV. (*Id.* at 15). The detectives each had their badges displayed and were utilizing flashlights which they focused on the interior of the SUV. (*Id.* at 15-16). Their guns remained holstered. (*Id.* at 15). As he approached, Detective Love observed a young male (who turned out to be Khyree) in the driver's seat and an older female, likely in her 60's sitting in the passenger seat. (*Id.* at 16). Both of these individuals were unknown to the detectives prior to this interaction. (*Id.* at 14, 24, 30). When Detective Goob arrived near the driver's side window, Khyree reacted to their presence in an extremely suspicious way, slamming the center console of the vehicle in a manner that Detective Love

5

acted out during the hearing. (*Id.* at 16, 18-19, 22, 26). Detective Love described Khyree as acting "panicked." (*Id.* at 16). Khyree then reached toward the cupholder in the center dash area of the SUV and Detective Goob asked him to stop reaching and keep his hands where they could see them. (*Id.* at 16-17). Detective Love explained that he did not hear exactly what Detective Goob was saying to Khyree at this point, but was later told that he (Detective Goob) had asked Khyree to stop reaching. (*Id.* at 17-18). Khyree started to comply with the detective's request and as he moved his hands both Detective Love and Goob immediately observed a torn knotted baggie corner in the cupholder. (*Id.* at 16). Detective Love admitted that if the car had pulled away while they were approaching, the occpuants of the SUV were free to leave and, at most, they may have returned to their vehicle and followed the SUV. (*Id.* at 26). He believed that he had probable cause to arrest Khyree at the point that they observed him slam the center console and saw the baggie corner in the cupholder. (*Id.* at 26).

After seeing the baggie corner, the detectives opened the doors on the driver's and passenger's sides of the SUV and started talking to the occupants. (Docket No. 2035 at 17). The passengers then gave conflicting responses to questions about what they were doing, and neither could identify the other occupant of the SUV. (*Id.* at 18-19). In this regard, Khyree told Detective Goob that he was talking to his "aunt" while the passenger, Beverly Cheatom, who is not related to Khyree, provided a false name for him and according to Detective Love, acted as if she had "no clue" who he was. (*Id.* at 19). Detective Goob asked Khyree whose SUV it was and he said initially that his girlfriend had rented the car, and then that his "aunt" had. (*Id.*). He produced the rental agreement to the detective which listed Jyuan Wood as the renter. (*Id.*; Govt. Ex. 5; Docket No. 1953-4).

The detectives next asked Khyree and Ms. Cheatom to exit the SUV and both complied. (Docket No. 2035 at 20). Detective Love observed Khyree get out of the vehicle through the open doors. (*Id.*). He heard him tell Detective Goob "I don't have anything, you can check the car." (*Id.*). Khyree then attempted to walk around Detective Goob, with the detective responding by directing him to stay against the car. (*Id.*). Detective Love saw Khyree turn his back to Detective Goob and shove his left hand in his left front pants pocket. (*Id.*). Detective Goob yelled at Khyree to stop reaching and get his hands out of his pocket. (*Id.*). At first, Detective Love could not tell what he was reaching for and believed it may be a weapon; however, as Khyree pulled his hand from his pocket, he could clearly see a brick of heroin sticking halfway out of the pocket. (*Id.*). Detective Love then reached through the vehicle, and grabbed Khyree's wrist as Detective Goob shoved him against the SUV, movements which the witness also demonstrated to the Court during the hearing. (*Id.* at 20-21). Simultaneously, Detective Love exclaimed that "he's got some heroin on him." (*Id.* at 20-21). Khyree was then handcuffed. (*Id.*).

Detective Love removed the brick of heroin that was protruding from Khyree's pocket and then upon a further search of his pocket, located an additional 3 stamp bags of heroin, for a total of 53 stamp bags. (*Id.* at 21). The stamp bags were stamped with a Dracula stamp in red ink. (*Id.* at 21-22). He also recovered $481 in United States currency from the same pants pocket. (*Id.* at 22). Upon a search of the vehicle, the detectives recovered the baggie corner from the cupholder; and five knotted baggies of crack cocaine from the center console. (*Id.* at 22). Detective Goob also recovered cell phones from Khyree's person upon a search incident to the arrest. (*Id.*).

Defendant filed the instant motion to suppress on January 4, 2017, ([Docket No. 1808](#)), to which the Government filed a response in opposition on January 27, 2017, ([Docket No. 1953](#)). As noted, this Court held a motion hearing on February 23, 2017. ([Docket Nos. 2014](#); 2035). In accordance with the Court's Order, the parties submitted post-hearing proposed findings of fact and conclusions of law, with the Government making its filing on March 6, 2017 and Defendant submitting his on March 7, 2017. ([Docket Nos. 2052](#); [2056](#)). As the matter has been fully briefed and argued, it is now ripe for disposition.

## III. LEGAL STANDARD

It is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *[United States v. Richardson](#)*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted).

## IV. DISCUSSION

In his motion to suppress, Khyree challenges the evidence seized from him and a vehicle he was sitting in without a warrant on January 15, 2015 under the Fourth Amendment to the United States Constitution. ([Docket Nos. 1808](#); [2056](#)). The seized evidence included: one brick of heroin and three stamp bags of heroin recovered from his front left pants pocket; five knotted baggies of crack cocaine recovered from the center console of the vehicle; $481.00 recovered from his person; a torn baggie corner recovered from the cup holder of the vehicle; and Samsung and LG cell phones recovered from his right jacket pocket. (Govt. Ex. 5; [Docket No. 1953-4](#)). The Government maintains that the evidence should not be suppressed as it was not obtained in violation of Khyree's Constitutional rights. ([Docket Nos. 1953 at 105-08](#); [2052](#)).

The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. CONST. AMEND. IV; *see also United States v. Ubiles*, 224 F.3d 213, 216 (3d Cir. 2000). Warrantless searches are *per se* unreasonable subject only to a few specifically established and well delineated exceptions. *Horton v. California*, 496 U.S. 128, 133 (1990). Because no warrant authorized the search here, the burden is on the Government to prove by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement. *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). Any evidence obtained pursuant to a search that does not meet a recognized exception to the warrant requirement must be suppressed as "fruit of the poisonous tree." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).

One exception to the warrant requirement is a *Terry* stop and frisk. Generally, *Terry v. Ohio*, 392 U.S. 1 (1968), permits a police officer to conduct "a brief investigatory stop when he or she has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). Reasonable suspicion, while not rigidly defined, may be the result of the following factors: "specialized knowledge and investigative inferences," "personal observation of suspicious behavior," "information from sources that prove to be reliable, and information from sources that-while unknown to the police-prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip." *Brown*, 448 F.3d at 247 (citation omitted). Depending upon the totality of the circumstances, reasonable suspicion may be the result of one or a combination of the above and other relevant factors. *Id.*

In evaluating the officer's actions, the Court must defer to the "officer's knowledge of the nature and nuances of the type of criminal activity the officer has observed." *United States v.*

9

*Robertson*, 305 F.3d 164, 166 (3d Cir. 2002) (citing *United States v. Nelson*, 284 F.3d 472 (3d Cir. 2002)). In addition, the United States Court of Appeals for the Third Circuit gives considerable deference to police officers' determinations of reasonable suspicion. *See, e.g., Nelson*, 284 F.3d at 482. Similarly, courts often defer to personal observations and conclusions on the theory that experienced officers can infer criminal activity from conduct that may seem innocuous to a lay person. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also Wardlow*, 528 U.S. at 124.

The Third Circuit has applied the so-called "'collective knowledge doctrine'—under which the knowledge of one law enforcement officer is imputed to the officer who actually conducted the seizure, search, or arrest," *United States v. Whitfield*, 634 F.3d 741, 745 (3d Cir. 2010), in various circumstances, including reasonable suspicion to conduct a *Terry* stop and frisk, *id.*; probable cause for a warrantless arrest, *see United States v. Belle*, 593 F.2d 487, 497, n.15 (3d Cir. 1979); and, seizures under the plain view doctrine, *see United States v. Menon*, 24 F.3d 550, 562 (3d Cir. 1994). The collective knowledge doctrine allows officers "'to act on the strength' of work done by fellow officers" when they are engaged in joint law enforcement activities. *United States v. Gonzalez*, 630 F. App'x 157, 161 (3d Cir. 2015) (quoting *Whiteley v. Warden*, 401 U.S. 560, 568 (1971)). "Under the rule, determinations concerning the existence of reasonable suspicion can be made based on the knowledge of the officer conveying the information, not on 'whether those relying on the [information] were themselves aware of the specific facts which led their colleagues to seek their assistance.'" *Gonzalez*, 630 F. App'x at 161 (quoting *United States v. Hensley*, 469 U.S. 221, 231 (1985)).

"The initial step in our suppression analysis is to determine whether a seizure has taken place and, if so, when the seizure occurred." *United States v. Brown*, 765 F.3d 278, 288 (3d Cir.

2014) (citing *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008); *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003)) (stating that in conducting a suppression analysis, the court "must first determine at what moment [the defendant] was seized"). A Fourth Amendment seizure "does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Likewise, an officer shining a flashlight into the interior of a vehicle from a position outside the vehicle does not constitute a seizure. *See Texas v. Brown*, 460 U.S. 730, 739-40 (1983) ("It is likewise beyond dispute that Maples' action in shining his flashlight to illuminate the interior of Brown's car trenched upon no right secured to the latter by the Fourth Amendment."). Rather, "[a] seizure occurs only 'when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *Terry*, 392 U.S. at 19-20 n. 16)).

Here, the Government contends that the earliest point in time that the Fourth Amendment seizure occurred in this factual scenario was when Detective Goob told Khyree to exit the vehicle and he acceded to such request. (Docket Nos. 1953 at 106; 2052). Khyree suggests that the seizure took place at an earlier point in the encounter, i.e., when he was still sitting in the vehicle and was asked by Detective Goob to stop reaching and he complied. (Docket No. 2056). Having carefully considered the parties' positions in light of the totality of the credible facts established at the hearing, the Court agrees with the Government that the initial discussion between Detective Goob and Khyree constituted a mere encounter that did not ripen into a seizure for Fourth Amendment purposes until they opened the doors and Khyree was ordered out of the SUV.

To this end, three experienced narcotics detectives were patrolling an "extremely" high crime area known for drug and gun activity at nighttime (7:55 p.m.) near Red's Bar on the 300 block of E. Warrington Avenue, an area where they had made numerous arrests in the past and frequently surveilled for drug activity. *Cf. United States v. Edmonds*, 2013 WL 6002234, at *10 (W.D. Pa. Nov. 12, 2013), *aff'd* 606 F. App'x 656 (3d Cir. 2015) ("the officers' awareness of prior violent crimes having occurred in the general vicinity is certainly one of the factors which must be considered in the evaluation of all of the evidence"). They observed suspicious activities as two individuals were sitting in a parked SUV across the street from a nuisance bar, Red's Bar, but the vehicle was not running, despite the facts that it was winter and 25 degrees outside. *See Brown*, 448 F.3d at 247 ("personal observation of suspicious behavior," may support reasonable suspicion). As they drove past the SUV initially, Detectives Goob and Love observed both of the occupants looking down at the center console. *Brown*, 765 F.3d at 290 (observation of furtive movements consistent with attempting to conceal something support reasonable suspicion). When the detectives exited their vehicle and approached the parked SUV, they had only flashlights drawn and clearly observed Khyree slam the center console shut and reach for the center cup holder. *Id.*

In this Court's opinion, the record developed at the hearing demonstrated that Detective Goob "asked" Khyree to stop reaching while shining a flashlight into the SUV. (Docket No. 2035 at 16-17). There was no evidence introduced into the record establishing that Detective Goob yelled or commanded him to do so in a manner that constituted a show of authority that restrained Khyree's ability to leave. *Cf. Brown*, 765 F.3d at 289 ("There was nothing about the detectives' brief initial approach that constituted a Fourth Amendment seizure. The evidence at the suppression hearing shows that the detectives did not activate their lights or sirens, brandish

their weapons, block Brown's path, physically touch Brown, or make any threats or intimidating movements."). Indeed, Detective Love credibly explained that from his position on the other side of the vehicle, only a few feet away, he could not even hear what Detective Goob initially said to Khyree. (Docket No. 2035 at 17-18). Rather, Detective Love only learned what was said after the encounter when discussing the day's events with Detective Goob. (*Id.*). It is also uncontested that the detectives did not draw their weapons, or activate the sirens or emergency lights as they approached the vehicle. (*Id.* at 13-14, 31-32).

As is outlined above, caselaw plainly establishes that a law enforcement officer merely approaching an individual and asking questions in this manner does not represent the type of show of authority that would ripen into a Fourth Amendment seizure. Further, the utilization of flashlights to illuminate the interior of a vehicle does not transform the encounter into seizure. *See Brown*, 460 U.S. at 739–40 ("It is likewise beyond dispute that Maples' action in shining his flashlight to illuminate the interior of Brown's car trenched upon no right secured to the latter by the Fourth Amendment."). Finally, the Court credits Detective Love's explanation that if Khyree had turned on the car and driven away at that point, he was free to leave and that they would have, at most, followed the vehicle. (Docket No. 2035 at 26).

As Khyree started to move his hand away from the cupholder, the detectives clearly observed, in plain view, a baggie corner that the experienced detectives immediately recognized as drug paraphernalia. (Docket No. 2035 at 16, 21). While possessing a baggie corner may not appear illegal to a lay person, "the Supreme Court has upheld a number of stops based on an officer's observation of entirely legal acts, where the acts, when viewed through the lens of a police officer's experience and combined with other circumstances, led to an articulable belief

13

that a crime was about to be committed." *United States v. Goodrich*, 450 F.3d 552, 564 (3d Cir. 2006).

At this juncture, the detectives had at least reasonable suspicion that the occupants were involved in drug trafficking activity given the totality of the circumstances, i.e., two individuals sitting in a parked SUV in a high crime area, with the engine off on a cold winter evening, peering at the center console of the vehicle and then one of the individual's slamming the center console as the detectives approached and illuminated their flashlights into the interior of the SUV. In any event, despite his arguments to the contrary, the record shows that Khyree had not fully complied with the detective's request prior to them viewing the contraband.

It is the Court's opinion that the earliest point in time that a seizure occurred was when the detectives opened the doors to the vehicle because a reasonable person in Khyree's position would feel that his liberty was restrained by a law enforcement officer taking that type of action. *Cf. Couden v. Duffy*, 446 F.3d 483, 494 (3d Cir. 2006) ("Officer Armstrong clearly restrained the freedom of Couden and her children when he approached them, pointed a gun at Couden, and tried to open one of the doors to the car."). The only way that Khyree could leave would have been to turn the SUV on and then drive away; something that a reasonable person would not do in such situation as it would pose a clear safety risk to the occupants of the car and the officers since both doors were open. *Id.* (concluding that a seizure took place even though the driver pulled away from the attempt to open the door). With that said, the Court finds that the detectives had reasonable suspicion to open the doors and speak to the occupants and that this represented an investigatory seizure which was fully justified by the totality of the facts and circumstances. *See Wardlow*, 528 U.S. at 123 ("an investigatory seizure is justified if the officers have "reasonable, articulable suspicion that criminal activity may be afoot."). Again, the SUV

was not running and it is reasonable to infer that the windows could not have been lowered by Khyree without turning on the vehicle. Further, the opening of the doors did not occur until both detectives observed the baggie corners in the cupholder of the vehicle, immediately identifying the same as contraband. After reviewing the totality of the objective facts in this scenario, the Court concludes that the detectives had reasonable suspicion to conduct a brief investigatory detention in the manner that they did in this case. *See United States v. Cortez*, 449 U.S. 411, 417 (1981) (the Court must look to the "totality of the circumstances - the whole picture" to see whether the officer had a particularized, objective basis for his or her suspicion.").

Moving on, the detectives did not proceed to search the vehicle or direct the occupants out of same; rather, they questioned them concerning their activities. In response, Khyree and his passenger provided inconsistent information about their relationship, the female passenger had "no clue" who Khyree was and he provided two false statements concerning the renter of the vehicle, which did not match the rental agreement stating that Jyuan Wood was the renter. *See United States v. Thach*, 411 F. App'x 485, 489 (3d Cir. 2011) ("Both officers became aware that the occupants' stories were inconsistent and that none of them was authorized to drive the car."). He also acted nervously and evasively throughout the encounter. *See e.g., Wardlow*, 528 U.S. at 124 ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."). Certainly, the significantly experienced detectives now had sufficient information to direct Khyree to exit the vehicle, within which he could not demonstrate a legal right to be present at the time.

Khyree's suspicious behavior continued as he exited the vehicle, attempted to walk away from Detective Goob, and then placed his hands in his pockets in what appeared to Detective Love to be movements taken in an effort to conceal something. (Docket No. 2035 at 20). The

15

totality of these circumstances then gave the detectives reasonable suspicion to conduct a protective frisk of Khyree, particularly in light of the credible testimony of Detective Love that he did not know if he had a firearm or not, as well as their experience with firearms arrests and knowledge of homicides in the 300 block of E. Warrington, which the parties agree is a high crime area. *See Terry*, 392 U.S. at 26, 29 (A protective frisk must be strictly "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby," such as "guns, knives, clubs, or other hidden instruments [possibly used] for the assault of the police officer,"). However, simultaneously, Detective Love observed a brick of heroin protruding from Khyree's pants pocket, providing probable cause to arrest him and to conduct the further searches of his pockets as well as the vehicle. In fact, Khyree does not even have a reasonable expectation of privacy in the contents of the vehicle given his status as an unauthorized driver, or at least his failure to demonstrate that the rental company (or the individual named on the rental agreement) had authorized him to be in the vehicle at the time. *See United States v. Kennedy*, 638 F.3d 159, 168 (3d Cir. 2011) ("Although Kennedy had the permission of the renter to operate the vehicle, he did not have the permission of the owner. As examined above, any expectation of privacy he subjectively held in the vehicle was therefore objectively unreasonable. Accordingly, we hold that Kennedy lacks standing to contest the search of the rental vehicle.").

To conclude, after careful consideration of the evidence of record, the Court finds that the Government has established by a preponderance of the evidence that the law enforcement activities leading up to Khyree's arrest were justified under the relevant Fourth Amendment principles discussed above. *See Cortez*, 449 U.S. at 417. Accordingly, his motion to suppress will be denied.

## V. CONCLUSION

Based on the foregoing, Khyree's motion to suppress is denied. An appropriate Order follows.

*/s Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Date: March 16, 2017

cc/ecf: All counsel of record.

Khyree Gardenhire c/o Christy Foreman, Esquire